**SO ORDERED: August 17, 2011.**





**Anthony J. Metz III**
**United States Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| GARY L. HARMON | ) | Case No. 08-9999-AJM-7 |
| | ) | |
| Debtor | ) | |
| _____ | ) | |
| | ) | |
| BRIAN L. WHITESELL | ) | |
| | ) | |
| Plaintiff | ) | Adversary Proceeding No. 08-50643 |
| Vs. | ) | |
| | ) | |
| GARY L. HARMON, SAMUEL T. TRAFELET | ) | |
| and WACHOVIA BANK | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |
| | ) | |
| SAMUEL TOD TRAFELET, JR. | ) | Case No. 09-670-AJM-7 |
| | ) | |
| Debtor | ) | |
| | ) | |
| WACHOVIA BANK, N.A. | ) | |
| | ) | |
| Plaintiff | ) | Adversary Proceeding No. 09-50233 |
| Vs. | ) | (consolidated under Adversary Proceeding |
| | ) | No. 08-50643) |
| | ) | |
| SAMUEL TOD TRAFELET, JR. | ) | |
| | ) | |
| Defendant | ) | |
| _____ | ) | |

1

|  |  |  |
|---|---|---|
| SAMUEL TOD TRAFELET, JR. | ) | Case No. 09-670-AJM-7 |
| | ) | |
| Debtor | ) | |
| | ) | |
| BRIAN L. WHITESELL | ) | |
| | ) | |
| Plaintiff | ) | Adversary Proceeding No. 09-50256 |
| | ) | (consolidated under Adversary |
| | ) | Proceeding No. 08-50643) |
| Vs. | ) | |
| | ) | |
| SAMUEL TOD TRAFELET, JR. and | ) | |
| WACHOVIA BANK, N.A. | ) | |
| | ) | |
| Defendants | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Brian L. Whitesell ("Plaintiff" or "Whitesell") filed his Complaint against the Defendants, Gary L. Harmon ("Harmon"), Samuel T. Trafelet ("Trafelet") and Wachovia Bank National Association ("Wachovia") in Adversary Proceeding No. 08-50643 on December 8, 2008. The Complaint seeks a determination of nondischargeability against Harmon, a request for indemnification against Trafelet and certain injunctive and declaratory relief against Wachovia. After that Complaint was filed, Trafelet filed his own bankruptcy, and Whitesell likewise filed a nondischargeability action against Trafelet (Adversary Proceeding 09-50256), and sought injunctive and declaratory relief against Wachovia. Wachovia filed its own dischargeability action against Trafelet on April 8, 2009 (Adversary Proceeding 09-50233). The two Trafelet adversary proceedings were consolidated under the Harmon adversary proceeding (08-50643) on July 8, 2009. The Court tried these three adversary proceedings together on June 9, 2011 wherein Harmon and Trafelet appeared in person and by their counsel, Keith Gifford and Nathan Gooden; Wachovia appeared by its counsel, Louis Perry and Kayla Britton; and Whitesell appeared by his counsel, Harley Means and Steven Runyan. At the conclusion of the trial, the Court took ruling on the matter under advisement and directed the parties to submit

2

proposed findings and conclusions.  The parties have complied with that directive.

### Findings of Fact

1.    Harmon and Trafelet have been friends for approximately thirty (30) years and met
      Whitesell when they were college students at Ball State University in the mid-1980's.
      The three of them have been involved in various real estate investment and property
      management businesses.

2.    Harmon is a licensed mortgage broker and was at one time a licensed real estate agent.
      Trafelet has been a licensed real estate agent since 2001 and was a licensed mortgage
      broker from 2000-2008.  He currently owns two real estate brokerage firms, Sun Reach
      Properties and Eco Realty Partners. Trafelet worked in Harmon's mortgage brokerage
      business, Investor Mortgage Services, from 2000 through 2006, at which time he took
      over the business and operated it until on or about 2008 or 2009.  Trafelet closed
      approximately fifty (50) to seventy-five (75) deals as a mortgage broker and sold
      approximately ten (10) to twelve (12) properties as a real estate agent.

3.    Whitesell currently is a consultant in the recycling businesses but has owned rental
      properties with Harmon in Indiana.  He has also purchased real estate in Arizona for
      investment purposes. Whitesell testified that he never "handled" closings while he was
      involved in businesses with Harmon and Trafelet , but that he was present for closings
      and that he had not given anyone permission to sign his name or a power of attorney to
      sign his name to loan documents at closings.

4.    Prior to April, 2005, Harmon and Trafelet purchased property in a luxury real estate
      development known as The Conservatory at Hammock Beach in Palm Coast, Florida
      ("The Conservatory") and resold it and made a profit in excess of $200,000.  Buoyed by

this success, Harmon and Trafelet sought to purchase more properties in The

Conservatory.  In the spring of 2005, Whitesell accepted Harmon's and Trafelet's

invitation to join them in the purchase of Lot 91 ("Lot 91") in The Conservatory.

5. The Conservatory was a development owned by the Ginn Companies ("Ginn"), a luxury

real estate developer in Florida.  Ginn is owned by Bobby Ginn, an acquaintance of

Harmon's and Trafelet's.  Harmon and Trafelet initially invested in properties developed

by Ginn but later sought to become loan brokers for prospective purchasers of Ginn

properties, for which they received a 1% referral fee.

6. Harmon's and Trafelet's purpose in purchasing properties in The Conservatory was to

"flip" them, i.e. resell them quickly at a handsome profit.  In addition to Lot 91, they also

invested in six to eight lots located in the The Conservatory and other Ginn communities.

7. Harmon and Trafelet represented to Whitesell, and the three of them agreed, that each of

the three of them would own a one-third share of Lot 91 and that each of the three of

them would be liable for one-third of the purchase price (the "1/3 Ownership

Agreement").  Whitesell apparently was able to pay his one-third share without

borrowing money and he did not ask Harmon and Trafelet as to how they would finance

their respective shares, because he was under the impression that he was liable for only a

third of the purchase price.  Besides, Whitesell had deferred to Harmon to obtain

financing in other real estate deals he undertook with Harmon and Trafelet.

Consequently, Whitesell agreed to the transaction under the terms of the 1/3 Ownership

Agreement and in turn entered into an agreement with Dave Andress to split the

ownership and liability in Whitesell's share of Lot 91.  Thus, Whitesell ultimately agreed

to a one-sixth (1/6) share of the liability and profit.

8.      Given the history between the parties with respect to obtaining financing for property purchases, Whitesell understood that Harmon and/or Trafelet were handling the financing with respect to Lot 91 and that he would simply write a check to Trafelet for his monthly cost for the investment, all in accordance with the 1/3 Ownership Agreement.

9.      There is a dispute as to whether Whitesell submitted a loan application to Wachovia regarding the purchase of Lot 91.  Whitesell's nondischargeability complaint against Harmon recites that Whitesell, Harmon and Trafelet in early 2005 submitted a loan application to Wachovia for the purpose of purchasing Lot 91.  Yet, Whitesell's nondischargeability complaint against Trafelet recites that only Trafelet and Harmon submitted the loan application to Wachovia.  Whitesell testified that he did not remember submitting a loan application.  Wachovia does not have in its possession the original loan application but does possess electronic records related to loan applications purportedly submitted by Whitesell, Harmon and Trafelet on or about April 8, 2005 as well as Whitesell's social security number and his 2002 and 2003 tax returns.

10.     Whitesell testified that he did not know whether the purchase of Lot 91 would be with cash or with financing.  Harmon testified that he or Trafelet told Whitesell that the purchase of Lot 91 would be financed.  Harmon obtained financing for the purchase of Lot 91 from Wachovia Bank, National Association ("Wachovia") in the amount of $362,599.25.   About this same time, Harmon also obtained financing from Wachovia for the purchase of Lot 66 in The Conservatory.  Whitesell was not involved in the purchase of Lot 66.

11.     Wachovia's lending policy limited the number of times a particular individual could be the "primary borrower" on a loan (the "Lending Policy") which Harmon and Trafelet

learned of when they applied to Wachovia for financing for the purchase of Lot 91. Because both Harmon and Trafelet had already met this limit due to other pending deals with Wachovia, neither could be the primary borrower with respect to the loan needed to purchase Lot 91. Harmon testified that "they" (Harmon and Trafelet) informed Whitesell that they could not be the primary borrowers on the loan for Lot 91; Whitesell testified that he was not aware that he would need to be the "primary borrower" and that he understood his liability to be limited to one-third of the loan amount as set forth in the 1/3 Agreement.

12. The closing of the purchase of Lot 91 was scheduled for Monday, April 25, 2005. On April 21, 2005, four days before the scheduled closing, Wachovia sent correspondence to Whitesell at this home informing him that the proceeds of the "loan" were disbursed and invited him to contact Wachovia with any questions. Whitesell does not remember receiving this correspondence. A separate letter was sent to Whitesell at his home congratulating him on the "financing requested". Whitesell denies receiving this "congratulatory" letter.

13. The closing of the purchase of Lot 91 occurred on April 25, 2005 as scheduled. Harmon and Trafelet attended the closing, but Whitesell did not. The two primary documents that required signatures were a promissory note payable to Wachovia in the amount of $362,599.25 (the "Note") and a mortgage granted to Wachovia in Lot 91 (the "Mortgage") securing payment of the Note. The Note provided for a balloon payment to be made on May 13, 2008 and also provided that the borrower and the co-signors were joint and severally liable for the entire amount of the Note. Trafelet signed Whitesell's name as the "borrower" on both the Note and Mortgage. Harmon and Trafelet each

signed the Note in their individual capacities as "guarantor - co-signor".  The signatures on the Mortgage were notarized by Tera Preuss, who knew Harmon and Trafelet from previous business dealings.  After the Note and Mortgage were signed, they were transmitted to Florida where the closing subsequently took place.  Although there were discrepancies between their §341 meeting testimony and their deposition and trial testimony, Harmon and Trafelet testified that they received a 1% referral fee from Ginn for the purchase Lot 91 but did not disclose this to Whitesell.

14.    Shortly after the Lot 91 closing, Harmon or Trafelet notified Whitesell that the purchase of Lot 91 had been completed.  Whitesell testified that Harmon and Trafelet told him that the Lot 91 investment had "moved forward" but that Whitesell did not know the identity of the lender.  Nonetheless, Whitesell understood, based on his handshake deal with Harmon and Trafelet, that he (Whitesell) was responsible for his one-third share of the investment, pursuant to the 1/3 Ownership Agreement.

15.    For thirty-one (31) months, Whitesell sent Trafelet checks for his monthly cost of the investment (one-third of the monthly mortgage payment) and he understood that Trafelet was sending the full monthly payment to Wachovia.  Mortgage interest statements for tax years 2005 through 2008 were sent to Whitesell's home address.  Whitesell testified that he was unable to recall whether he took a deduction on his federal income taxes for the interest paid but his tax returns for those years indicated that he deducted the interest as a business expense.

16.    During September 2007, Whitesell became aware that Harmon and Trafelet were experiencing financial difficulties.  At about that same time, Whitesell became aware of a class action lawsuit filed in the United States District Court for the Eastern District of

Michigan against Ginn regarding The Conservatory as well as other Ginn developments.

17.     Harmon sent an email to Trafelet, Whitesell, and others, discussing the Michigan class action and stating that he was attempting to arrange a meeting with Bobby Ginn.  After exchanging a series of emails with Harmon concerning the Lot 91, Whitesell telephoned Wachovia to obtain information at which time he says he learned for the first time that he was designated as the primary borrower on the Note and Mortgage.  This contradicted Whitesell's previous understanding that he was liable only for a third of the purchase price borrowed for Lot 91 under the 1/3 Ownership Agreement.  Rather than each being an owner of a one-third interest and being liable for one-third of the purchase price, Whitesell was obligated on the entire loan.

18.     Whitesell testified that it was between September 26 and October 8 of 2007 when he first discovered he was the primary borrower on the Note.  He testified that he sought legal counsel shortly thereafter, contacting attorneys in two Indianapolis law firms in addition to Tera Preuss, the notary who notarized the signatures on the Mortgage.  Ultimately, Whitesell retained the law firm of Kroger Gardis & Regas and first met with attorney Jim Lauck of that firm in January, 2008.

19.     Whitesell testified that he gave an affidavit of forgery to his counsel but did not recall whether he signed it.  He testified he did not know whether his counsel forwarded the affidavit to Wachovia.

20.      There appears to be no dispute that Whitesell did not sign the Note and Mortgage. Handwriting expert James Steffen testified that the comparison of Whitesell's handwriting exemplar with the signature on the Note and Mortgage established that it was not Whitesell's signature on the Note and Mortgage.  Steffen further opined that Whitesell's

name on the Note and Mortgage appeared to be signed by Trafelet and that it was "disguised" writing in that it was written in a stunted, slow manner, indicating that Trafelet or whoever signed Whitesell's name attempted to hide his true identity.

21.    Whitesell was designated on the Note as the "primary borrower" which he had to be in order for the loan for Lot 91 to be approved, in light of the Lending Policy.  Yet, there is no dispute that Whitesell was not present at the closing.  The parties have stipulated that Whitesell did not give Harmon or Trafelet a power of attorney to sign his name on the Note and Mortgage.  Harmon testified at trial that he had spoken with Whitesell by phone on the morning of the closing whereby Whitesell was on his way out of town and therefore granted Harmon authority to sign the Note and Mortgage on Whitesell's behalf. Trafelet further stated that Harmon "mentioned that Whitey (his nickname for Whitesell) was out of town and asked us to take care of the closing." Harmon later wavered in his testimony and testified that he and Whitesell perhaps did not speak by telephone the morning of the closing but rather, a few days before the closing.  Harmon acknowledged that Whitesell may have been out of town on April 25, 2005, en route to Evansville, Indiana, without knowing the documents would be signed that day, although Harmon agreed it would be highly unusual to not have that date set out well in advance and notice provided to the primary borrower on the loan.  Whitesell testified that the closing would have been on his calendar had he known about it.  The closing occurred on a Monday and Whitesell testified that he did not travel out of town on Mondays.  Whitesell's calendar indicated that he was in town on the day of the closing.

22.    Trafelet remembered few specifics about the closing.  Trafelet testified he did not recall who signed Whitesell's name to the Note and Mortgage at the closing.  He also testified

that he believed he signed his name to the Note and Mortgage in Tera Pruess' office, but did not recall who was present when the Note and Mortgage were signed. He did acknowledge that it "appeared" that he had signed Whitesell's name on the Note and Mortgage, but that he didn't specifically remember. Trafelet did not recall whether he signed the Notes and Mortgages for both Lot 91 and Lot 66 at the same time, but acknowledged it was possible. Harmon testified that he believed that he and Trafelet signed the Lot 91 and Lot 66 loan documents at the same time. Trafelet also testified that he believed Harmon knew that he signed Whitesell's name and that he (Trafelet) would not have signed it without Harmon's knowledge. Harmon, on the other hand, could not explain why he had Trafelet sign Whitesell's name on the Note and Mortgage for Lot 91 when he was the individual that purportedly spoke with Whitesell and was the individual Whitesell purportedly authorized to sign his name. Nor could Harmon explain why he believed the Lot 91 closing would be consummated with the notary's seal without the attendance of the primary borrower and without a power of attorney from the primary borrower, other than to offer that Tera Preuss, the notary, knew Harmon, Trafelet, and Whitesell. Nor does Trafelet recall any conversation following the Lot 91 closing in which he confirmed to Whitesell that he (Trafelet) had signed Whitesell's name for him. Trafelet did not recall any conversation with Whitesell in which he or Harmon informed Whitesell that he would be jointly and severally liable for the purchase price.

23.    Trafelet's memory fared no better regarding copies of the documents executed at the closing. Trafelet acknowledged that he has always received copies of closing documents when leaving a closing, and that it would be prudent to receive copies. However, while he acknowledged he may have received copies of documents executed at the Lot 91 closing

10

at some point in time, he could not recall if he received copies on the day of the closing, how long he may have kept them, and why or when he destroyed his copies. He also did not personally remember ever providing copies of the documents regarding the Lot 91 closing to Whitesell. Trafelet could not explain why he would not turn over documents to Whitesell as he was the primary borrower and Trafelet acknowledged that he should have done so.

24. Furthermore, Harmon and Trafelet could not explain why Whitesell sent his monthly one-third payment to Trafelet , who in turn sent the full monthly payment on the Note to Wachovia.

25. Whitesell sent an email to Harmon on October 8, 2007, shortly after he learned that he was primary borrower on the Note, in which Whitesell wrote, in part, that he was "completely stunned that you would put me in the position given our history. How are you guys going to resolve this? I hope this is a huge misunderstanding and there is an explanation."

26. Through and including December 2007, Whitesell continued to send his monthly payment for Lot 91 to Trafelet . The December 2007 payment was the last payment submitted by Trafelet to Wachovia. Once Trafelet ceased payments, and on the advice of counsel, Whitesell made the full monthly mortgage payments to Wachovia for the months of January, February, March and April of 2008. Whitesell testified that it was essential he maintained the payments on the loan because a negative report on that loan would detrimentally affect his other outstanding business loans that were coming up for renewal. Harmon reimbursed Whitesell for the 2/3 share of the monthly payment due from Harmon and Trafelet.

11

27.     On May 2, 2008, Trafelet called Whitesell and left a particularly telling voice mail in

        which Trafelet stated as follows:

        Hey, Whitey,
        What's going on?  It's Traf.  It's Friday afternoon, just checking in with you.  I was just
        kind of going through some of that paperwork I was getting together for that BK lawyer
        and wanted to give you a quick call and give you kind of a breakdown on that.  It actually
        looks like I -- I may have signed that for us.  And it certainly wasn't anything of a
        deceptive nature.  And, honestly, I can't recall the circumstances of why the hell I would
        have done that.  I mean I am sure Harmon said, hey, you know, Whitey is out of town,
        sign this and get it back there.  I don't know what the hell I was thinking, Buddy, but I did
        -- did just pull that out and I looked at it and I was like holy shit.  So I wanted to give you
        a call and let you know.  I don't know what we need to do or whatever I need to do and try
        to make that right, Buddy, I certainly will, take full responsibility for it.  I just -- I,
        honestly, I have been racking my brain, I don't know why the hell I would have done that
        honestly, but did want to reassure that was certainly nothing to mislead you or anything of
        that nature, Buddy, but give me a call.  I want to talk that over with you and figure out
        what we need to do and we will go from there, Man.  Thanks, Buddy.  See you. [1]

At trial, Trafelet characterized the voicemail as reaching out to "clarify the specifics."

28.     The balloon payment on the Note came due in May 13, 2008.  On June 2, 2008 and July

        22, 2008, Harley Means of Kroger Gardis & Regas, Whitesell's attorneys, sent to Steve

        Roberts, an employee with Wachovia's Loss Management Retail Credit division, a letter

        informing him that Whitesell's signature was improperly affixed to the loan documents

        for Lot 91 and that all correspondence regarding the matter should be directed to Mr.

        Means, or his co-counsel, Mr. Jim Lauck.

29.     Sometime in August of 2008, Whitesell and/or his counsel had telephone conversations

        with Allen Ezell, Vice President of Corporate Fraud Investigation Services, concerning his

        allegations of forgery in connection with loan for Lot 91.  Sometime in July or August of

        2008, Whitesell and/or his counsel again had telephone conversations with Steve Roberts

        of Wachovia concerning his allegations of forgery in connection with the loan for Lot 91.

---

[1] Whitesell testified that "Traf" is a nickname for Trafelet and "Whitey" is a nickname for Whitesell.

30.   On August 18, 2008, Harmon filed his chapter 7 case and valued his interest in Lot 91 at $125,000.  On January 23, 2009, Trafelet filed his chapter 7 case but did not claim an ownership interest in the Lot 91 but did identify it as a property for which he was a guarantor.

### Conclusions of Law

1.   The Court has jurisdiction to hear and determine the cause of action pursuant to 28 U.S.C. § 15 and 28 U.S.C. § 1334.  Venue is proper pursuant to 28 U.S.C. § 1409.

2.   This action consists of three consolidated adversary proceedings, each of which has been brought pursuant to 11 U.S.C. § 523(a)(2)(A) to determine the dischargeability of the amounts owed on the Note by Samuel Trafelet and Gary L. Harmon.

3.   Exceptions to discharge under §523 are "to be construed strictly against the creditor and liberally in favor of a debtor."  *In re Scarlata*, 979 F.2d 521,524 (7th Cir. 1992); see also, *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000).  A creditor that brings a §523 action seeking a determination of nondischargeability bears the burden of proving all the elements of the statute by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 289-90; 111 S.Ct. 654, 661; 112 L.Ed.2d 755 (1991).

4..   Under §523(a)(2)(A), an individual debtor shall not be allowed a discharge for any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by (A) false pretenses, a false representation, or actual fraud..." 11 U.S.C. § 523(a)(2).

5.   Section 523(a)(2)(A) list three separate grounds for dischargeability: actual fraud, false pretenses and false representation.  Although many courts have applied the same test to all three grounds, the Seventh Circuit has distinguished between the three grounds and has

13

formulated two different tests, one for the "false pretenses" and "false representation" grounds and another for the "actual fraud" ground. *In re Scarpello*, 272 B.R. 691, 699-700 (Bankr. N. D. Ill. 2002); citing *McClellan v. Cantrell*, 217 F.3d 890, 894 (7th Cir. 2000).

6.   To prevail on a nondischargeability claim under the "false pretenses" or "false representation" grounds set forth in §523(a)(2)(A), a creditor must prove *all* of the following elements: (1) the debtor made a false representation of fact (2) which the debtor (a) either knew to be false or made with reckless disregard for its truth and (b) made with an intent to deceive and (3) the creditor justifiably relied on the false representation. *Reeves v. Davis (In re Davis),* 638 F.3d 549, 553 (7th Cir. 2011); *Ojeda v. Goldberg*, 559 F.3d 712, 716-17 (7th Cir. 2010). See also, *Scarpello*, 272 B.R. at 700.

7.   "False representation" refers to express misrepresentations while "false pretenses" refers to implied misrepresentations. *Zamora v. Jacobs (In re Jacobs)*, 448 B.R. 453, 471 (Bankr. N. D. Ill. 2011). Whether express or implied, a misrepresentation can occur not just though a verbal or written representation, but also through a debtor's conduct that was intended to create a false impression, but the representation – regardless in what form made – must be with respect to a material fact. *Scarpello*, 272 B.R. at 700.

8.   "False pretenses" has been described as "a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances ...in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor....[it is] established or fostered willfully, knowingly, and by design; it is not the result of inadvertence". *Sterna v. Paneras (In re Paneras)*, 195 B.R. 395, 406 (Bankr. N. D. Ill. 1996).

14

9.     A slightly different test is used where the creditor alleges the debt is nondischargeable under the "actual fraud" part of §523(a)(2)(A).  In such cases, a creditor must prove (1) a fraud occurred; (2) the debtor was guilty of intent to defraud; and (3) the fraud created the debt that is the subject of the nondischargeability action.  *McClellan*, 217 F.3d at 893; *Scarpello*, 272 B. R. at 701.  Noteworthy is the fact that "actual fraud" is not limited to misrepresentation, and therefore, to state a claim under the "actual fraud" prong of §523(a)(2)(A), one need *not* allege misrepresentation and reliance thereon.  *McClellan*, 217 F.3d at 893; *Scarpello*, 272 B.R. 701.

10.    Actual fraud, encompasses a broader range of activity:

Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

*McClellan*, 217 F.3d at 893 (citations omitted).  See also, *In re Luedtke*, 429 B.R. 241, 259 (Bankr. N. D. Ind. 2010).

11.    Regardless of whether the debt was obtained by false pretenses, a false representation or actual fraud, the creditor must prove that the debtor acted with the intent to deceive.  With respect to "false pretenses" and a "false representation", proof of intent to deceive is determined by a review of all of the relevant factors of the particular case and is measured by the debtor's subjective intention *at the time the representation was made*.  Where a person knowingly or recklessly makes false representations which the person knows or should know will induce another to act, the finder of fact may logically infer an intent to deceive. *Mayer v Spanel International, Ltd (Matter of Mayer),* 51 F.3d 670, 673 (7th Cir. 1995); *Bletnitsky v. Jairath (In re Jairath),* 259 B.R. 308, 314 (Bankr. N. D. Ill. 2001).  In all cases, including "actual fraud" cases, intent may be established by circumstantial

15

evidence or by inferences drawn from a course of conduct. *McClellan*, 217 F. 3d at 893.

12. Finally, a creditor must prove that it reasonably relied on the debtor's false pretenses, false representation or actual fraud in transferring the property or extending the credit. "Justifiable" reliance is an "intermediate level of reliance" which falls between the more stringent "reasonable reliance" and the more lenient "reliance in fact". *Scarpello*, 272 B.R. at 700; *Field v Mans*, 516 U.S. 59, 74-75, 116 S.Ct. 437,133 L.Ed. 2d 351 (1995). This intermediate level of reliance "imposes no duty to investigate unless the falsity of the representation is readily apparent". *Scarpello*, 272 B.R. at 700. Whether there was justifiable reliance by the creditor is measured by a subjective standard; that is, the creditor must show that the debtor "made a material misrepresentation that was the cause-in-fact of the debt that the creditor wants excepted from discharge." *Scarpello*, 272 B.R. at 700; *Mayer*, 51 F.3d at 676.

13. An act of forgery constitutes both a false representation and a fraudulent act. *In re Cerar,* 97 B.R. 447 (C. D. Ill. 1989). In *Cerar*, a debtor forged the name of a family member on a promissory note owed to a bank that had been taken over by the FDIC. The forgery was done to circumvent the bank's lending limit for individuals, much like the case here, but, unlike the case here, the bank was aware that the family member's name had been forged. The debtor knowingly and intentionally gave a forged note to the bank and knew that the bank officials would use the forged note to deceive bank examiners and the FDIC into believing that the lending limit policy had not been breached. Despite "cooperation" by the bank in this scheme, the debt owed to the bank (and ultimately the FDIC) was declared

16

nondischargeable under §523(a)(2)(A). [2] . Plainly, debts arising from a debtor's forgery of a document upon which the creditor justifiably relied to transfer property or extend credit is nondischargeable under §523(a)(2)(A).  See, *In re Datatest, Inc. v. Lee (In re Lee),* 2000 WL 815928(Bankr. E. D. Pa.) at *7-8 (debtor forged wife's name on guaranty); *In re Zagar*, 136 B.R. 156, 159 (Bankr. N.D. Ohio 1992) (debtor forged transfer authorizations on customers' brokerage accounts); *In re Rudicil,* 123 B.R. 778, 781 (Bankr.N.D.Ohio 1991) (debtor forged wife's name to note and mortgage).

14.   It is undisputed that Whitesell did not sign the Note or the Mortgage and the Court simply does not find the testimony or Harmon or Trafelet to be credible with respect to their testimony that Whitesell authorized them to sign his name to the Note and Mortgage. With respect to the loan application Whitesell may or may not have submitted, the Court finds that whether Whitesell submitted a loan application to Wachovia is of no importance. Whitesell may have submitted an application but submitting an application did not bind him to a loan with Wachovia or cause him to be liable on the full amount of the loan needed for Lot 91.  Furthermore, it was extremely important for Harmon and Trafelet to close the loan on Lot 91, given their vested interests in Lot 91 and other lots in The  Conservatory.  The loan for Lot 91 could not have closed without Whitesell being designated as the primary borrower, so Whitesell was the "point man" for the Lot 91 loan and the loan would not have been made without him.  Given this reality, it is incredible to the Court that, as Harmon and Traflet suggest, Whitesell did not learn of the closing until a day or two before it was to have been held.  It is equally incredible that there was no

---

[2] Given the fact that the bank had been aware of the forgery in *Cerar*, one might think it difficult for the FDIC to prove that the bank reasonably relied on the forgery which in turn induced the bank to loan the money.  However, the court held that the FDIC was acting in its capacity as a receiver, and, under the *D'Oench* doctrine, was entitled to rely on the bank's written records and was not required to prove actual reliance.  *Cerar,* 97 B.R. at 450.

power of attorney drafted to ensure a smooth closing in the event the 'primary borrower" could not be present.  Yet, Whitesell was not aware of the closing and it did not appear on his calendar even though such an event would have, had he known about it.  Harmon testified that it was he (Harmon) who Whitesell spoke with a day or so before the closing and to whom he gave authorization to sign his name at closing, yet Trafelet signed Whitesell's name.  Had Whitesell truly given Harmon such authority, there would have been no reason for Harmon to "authorize" Trafelet to sign.

15.   Even more incredible is that fact that Trafelet - the one to whom authority to sign Whitesell's name allegedly had been given – recalled little about the closing or the documents signed at the closing.  Trafelet testified that, although he typically would have received closing documents at or soon after a closing, he was not sure whether he received copies of the documents at the closing of the sale of Lot 91.  Nor could he recall what he did with them or whether he gave copies to Whitesell.  A "primary borrower" on a $362,000- plus loan would demand copies of closing documents.  Likewise, one authorized to sign the name of a "primary borrower" for a $362,599.25 loan would see to it that the primary borrower got copies of the closing documents.

16.   With respect to the method of payment, a typical arrangement would have been for Whitesell as the "primary borrower" to collect Harmon's and Trafelet's shares of the monthly loan payment and remit his one-third share along with theirs to Wachovia.  The Court concludes it to be incredible, then, that Trafelet or Harmon  – "co-signors" and not "primary borrowers" had possession of the payment coupon book for over two years and did not relinquish it until late 2007 or early 2008 when their financial difficulties surfaced and  Whitesell became aware that his name had been forged on the Note and Mortgage.

18

17.  Finally, the Court concludes that the May 2, 2008 voicemail from Trafelet to Whitesell is the most compelling evidence that proves that Whitesell did not authorize Harmon or Trafelet to sign his name to the Note and Mortgage.  In that voicemail, Trafelet indicates he didn't know why he signed Whitesell's name or "what the hell" he was thinking.  He also indicated, "I don't know what we need to do or whatever I need to do and try to make this right" and vowed to "full responsibility for it". Such pronouncements are entirely inconsistent with one who had been authorized by Whitesell to sign his name.

### *Ratification*

18.  Wachovia, Harmon and Trafelt contend that Whitesell ratified the forged signature.

19.  The Note is an unconditional promise to pay Wachovia and therefore is a "negotiable instrument" pursuant to Ind Code §26-1-3.1-104.  A forged signature is among the types of signatures that are "unauthorized" under the general (Indiana) UCC definition section of Ind Code §26-1-1-201(43).  An unauthorized signature may be ratified under Ind Code §26-1-3.1-403(a).

20.  Comment 3 following §26-1-3.1-403(a) provides in part that:

     Ratification is a retroactive adoption of the unauthorized signature by the person whose name is signed and may be found from conduct as well as from express statements.  For example, it may be found from the retention of benefits received in the transaction with knowledge of the unauthorized signature.

21.  Wachovia, Harmon and Trafelet argue that Whitesell, by his conduct, ratified the forged Note and Mortgage because he (1) continued to make payments after he discovered the forgery; (2) received mortgage interest statements; (3) did not alert Wachovia of the potential fraud until after the balloon payment came due; and (4) accepted the benefits of the transaction by taking the mortgage interest deduction on his taxes.

22.  The Court concludes that Whitesell did not ratify the forged signature on the Note and

Mortgage. Whitesell had no reason to suspect that he was designated the "primary borrower" on the Note and Mortgage before late September, 2007. He may have received mortgage interest statements and deducted the interest on his taxes, but he believed he was liable for a third of the purchase price for Lot 91 (really, one-sixth of the purchase price, given his agreement with Andress) and it is plausible that he believed the mortgage interest statements and deduction pertained only to his portion. It was the class action lawsuit against Ginn and Ginn's development of the lots in the Conservatory, including Lot 91, that piqued his curiosity as to how ownership in Lot 91 was held. Upon learning that his name was on the Note and Mortgage, Whitesell immediately began a series of communications demanding that Harmon and Trafelet correct their wrongdoing. He also contacted Wachovia and three different attorneys within a reasonable amount of time after learning of the forgery. He emailed Harmon and Trafelet and expressed his disbelief that his signature would be forged and hoped that it was just a huge misunderstanding. Several of his emails to Harmon and Trafelet expressed his alarm over being named primary borrower. If he hesitated at all in alerting Wachovia to any fraud, it was because Harmon and Trafelet were trying to refinance the loan to remove Whitesell as primary borrower. Had Whitesell truly ratified the forgery, there would have been no need to refinance. At no time did Whitesell accept any supposed benefit associated with the increased liability that was occasioned upon him.

Rather, Whitesell continued to make payments on the Note because he did not want a negative credit rating, given the fact that other business loans of his were coming up for renewal. Conversely, at no time did Whitesell hold himself out as the sole owner of Lot 91 in order to obtain further loans, or take any other action that would be consistent with

sole ownership in that property.  Thus, Whitesell did not ratify his forged signature on the Note and Mortgage.  *Beneficial Mortgage Co. of Indiana v. Powers*, 550 N.E.2d 793, 796 (Ind. Ct. App. 1990) (wife, whose husband forged her name on loan documents and who contacted attorney within a short time after discovering forgery, did not ratify forged signatures when she insisted that house be put up for sale to pay obligation); *Duetscher v. Long (In re Southern Industrial Banking Corp.)*, 36 B.R. 1010, (defendant, whose name was forged on promissory note, the proceeds of which were used to buy bank stock of bank that later closed did not ratify forged signature, defendant retained no benefit as stock was worthless, never possessed stock certificate, and never exercised any of the rights associated with stock ownership).  See also, *Bates v. Hancock Bank (In re Bates)*, 2010 WL 2203634 (Bankr. S. D. Miss.) at *8 (bank's motion for summary judgment denied where there existed a genuine issue of material fact whether debtor ratified forged signature by asking for a payment deferral on payment of the forged note).  But see, *DiPietro v. Wachovia Mortgage, FSB (In re DiPietro),* 2011 WL 3292851 (Bankr. N.D. Cal.) (debtor, whose name was forged on promissory note, directed bank to make loan anyway once he discovered the forgery, and cashed check which he used to pay off debt).

23.     Since Whitesell did not ratify the forged Note and Mortgage, he is not liable to Wachovia and Wachovia shall take ***no*** action to collect from Whitesell any amounts due under the Note and Mortgage.

24.     Having concluded that Whitesell did not ratify the forged Note and Mortgage, the Court further concludes that the debt owed to Whitesell by both Harmon and Trafelet is nondischargeable under §523(a)(2)(A).  Harmon and Trafelet represented to Whitesell that he would be liable only for a third of the liability on Lot 91.  Once Harmon and Trafelet

discovered that neither could be primary borrowers on the loan, they nonetheless, through their silence, misrepresented to Whitesell that he was still liable only on a third of the purchase price, as previously agreed.  This misrepresentation through silence went on for over two years after the closing, as Trafelet or Harmon kept the coupon payment book and Whitesell remitted only his one-third share of the purchase price.  Through the silence and actions of Harmon and Trafelet, Whitesell had no reason to believe that he was liable for the full amount of the loan.  Trafelet acted deliberately and with the intent to deceive when he forged Whitesell's name on the Note and Mortgage. Harmon instructed Trafelet to sign Whitesell's name and not only knew about the fraudulent representation, but was a participant.  The actions of both of them going forward allowed Whitesell to believe the one-third agreement was still in place.  Whitesell justifiably relied on not only their verbal representations about his one-third share but also on their omissions to inform him otherwise, and has done so to his detriment. Whitesell paid $17,500 which represents a portion of his one-third share of liability for the purchase price of Lot 91.  Harmon and Trafelet argue that Whitesell agreed to pay one third of the purchase price and therefore Whitesell has not suffered damages by paying $17,500.  However, the purchase of Lot 91 was accomplished by obtaining a loan from Wachovia and the loan obtained was only made possible through Whitesell's forged signature on the Note and Mortgage.  Had the forgery not occurred, Whitesell would not have paid $17,500 because no loan would have existed.  Whitesell  has established each element of §523(a)(2)(A) by a preponderance of the evidence and is entitled to a judgment against Harmon and Trafelet in the amount of $17,500.

25.     Whitesell also asks for treble damages under the Indiana Crime Victims Relief Act

("ICVRA") (Ind Code §34-24-3-1).  However, Whitesell's complaints against Harmon and Trafelet make no mention of seeking treble damages regardless of under what theory or statute and therefore the court concludes that treble damages cannot be awarded.

26.   Whitesell, however, did pray for attorney fees in his nondischargeability complaints and Whitesell's admitted trial exhibit 14 consists of time sheets itemizing attorney fees in excess of $72,000 up through the period immediately preceding the trial.  The Court concludes these attorney fees are recoverable under the ICVRA and nondischargeable pursuant to *Cohen v. De La Cruz*, 523 U.S. 213 , 118 S.Ct. 1212 (1998).  With respect to attorney fees incurred at trial and post trial, Whitesell's attorneys are hereby directed to file within 30 days of the date of these findings and conclusions, an affidavit, with itemized time sheets attached, setting forth the fees that Whitesell incurred from trial to present.  Once that affidavit is filed, Harmon and Trafelet shall have fourteen (14) days to object to the reasonableness of the fees set forth in the affidavit.  The Court will set the matter for hearing in the event an objection is filed.  The fees awarded by the Court with respect to the trial and post trial work shall also be a nondishchargeable debt.

27.   Wachovia reasonably relied on the forged signature on the Note and Mortgage and advanced funds in the amount of $362,599.25 to its detriment.  The debt owed by Trafelet to Wachovia is also nondischargable under §523(a)(2)(A). Since the Court finds that the debt owed to Wachovia by Harmon and Trafelet is nondischargeable under §523(a)(2)(A), the Court will not address Wachovia's claim for nondischargeability under §523(a)(4).

THEREFORE, it is ORDERED, ADJUDGED and DECREED that:

1.   The Court declares, adjudges and finds that the signatures on the Note and Mortgage executed and delivered to Wachovia on or about April 25, 2005 are forgeries.  The Note

23

and Mortgage are void and Brain L. Whitesell is not liable to Wachovia under the Note and Mortgage;

2.    The debt owed to Wachovia by Harmon and Trafelet is nondischargeable under §523(a)(2)(A) and Harmon and Trafelet are jointly and severally liable for $358,733.67 plus 4.75% interest accruing since April 21, 2008;

3.    The debt owed to Whitesell by Harmon and Trafelet is nondischargeable under §523(a)(2)(A) and Harmon and Trafelet are jointly and severally liable $17,500; and

4.    Harmon and Trafelet are liable for attorney fees and court costs pursuant to I.C. 34-24-3-1 (the Indiana Crime Victims relief Act) and I.C. 35-43-5-2(b) (forgery) in the amount represented by Plaintiff's Exhibit 14 at trial and the additional amount to be determined by the Court after the filing by Whitesell's attorneys of an affidavit of fees within thirty (30) days of the date of these findings and conclusions and any hearing thereon.

Distribution:

Harley Means/ Steve Runyan, Attorneys for Brian Whitesell
Keith Gifford / Nathan Gooden, Attorneys for Gary Harmon and Samuel Tod Trafelet
Louis Perry / Kayla Britton,  Attorneys for Wachovia Bank, N.A.